UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RANDY PAUL,

                Plaintiff,              **DECISION AND ORDER**

    -vs-                   **No. 02-CV-6347(MAT)**

DONALD SELSKY, MARK SIMMONS,
JOHN DOE, a fictitious name, the
true name being unknown, the party
intended being the party or parties
who denied Plaintiff medical
treatment while he was incarcerated
at Gowanda Correctional Facility,
and [sic]

                Defendants.

## I.   Introduction

      Proceeding <u>pro</u> <u>se</u>, plaintiff Randy E. Paul ("Paul" or
"Plaintiff"), an inmate in the custody of the New York Department
of Corrections and Community Supervision, filed the instant action
pursuant to 42 U.S.C. § 1983 seeking compensatory and punitive
damages. He alleges that defendant Commissioners' Hearing Officer
Mark Simmons ("Simmons") who presided over his Tier III
disciplinary hearing held on March 27, 2001, violated his
procedural due process rights by relying solely on the misbehavior
report and Plaintiff's testimony to issue a finding of guilt.
Plaintiff alleges that defendant Donald Selsky ("Selsky"), Director
of Special Housing/Inmate Discipline, violated his procedural due
process rights by initially affirming the Tier III disciplinary
hearing and failing to properly train and supervise Simmons.

Plaintiff also claims that unnamed NYSDOCCS personnel were deliberately indifferent to his dental needs, namely, his request for a mouth guard to alleviate teeth-grinding during his sleep.

## II.  Background

Unless otherwise noted, the following are the undisputed facts viewed in the light most favorable to Plaintiff.

On March 24, 2001, Paul was housed at Gowanda Correctional Facility.  Corrections Officer ("CO") P. Burke, completed a misbehavior report that evening, at approximately 9:40 p.m. charging Paul with violating NYSDOCCS Prison Regulation 113.10, which provides that inmates shall not make or possess any item of contraband that may be classified as a weapon by description, use, or appearance.  The basis of the charge was an anonymous tip received by CO Burke that Paul had a razor taped under his bed.

When CO Burke escorted Paul from the rec room to his cube, he asked Paul if there was anything taped under his bed.  Paul replied that there was not.  CO Burke searched and found, taped underneath the bunk, a razor which had been altered to be used as weapon.  At CO Burke's request, Paul was able to produce his original razor from his locker.  CO Burke notified his sergeant and had Paul escorted to the Special Housing Unit ("SHU").

Paul was charged with Weapons Possession, specifically, Weapon/In area of responsibility, for which the recommended confinement time was three to six months, and the recommended loss

of good time was three to six months. Paul waived his right to select an inmate legal assistant and requested that five inmates testify on his behalf. However, all five inmates refused to do so: Richard Richardson said that he was in the yard; Brian Alnutt said he was in the back rec room, Jamie Smith was "down the hall"; Timothy Lawless "was not around when it happened"; and William Ridgeway stated, "I've only heard rumors that have been around the Dorm. There's no proof that can be used to support inmate Paul's Innocents [sic]." Exhibit ("Ex.") H to Declaration of J. Richard Benitez, Esq. ("Benitez Decl.") (Dkt. #69).

Hearings Officer ("HO") Simmons presided over the Tier III disciplinary hearing held on March 27, 2001. Paul was informed that he should present any oral or documentary evidence that he wanted to be considered, as well as raise any procedural claims or objections during the hearing so that HO Simmons could respond to them.

According to Paul, he was framed by inmates who were bothered by his teeth-grinding during his sleep.[1] (Paul has never contended that CO Burke was involved.) Paul explained at the Tier III hearing

---

[1]

The Second Circuit recently reaffirmed that "'a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.'" Velez v. Fischer, No. 11-2897-pr (2d Cir. May 25, 2012) (quoting Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986) and citing Boddie v. Schneider, 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report.")).

that because of his teeth-grinding, he had been threatened, beaten up in the middle of the night, pulled out of bed, and kicked and knocked around. Some inmates would kick his bed and throw his and their own boots at him during the night. Other inmates had threatened to choke him in his sleep and knock his teeth out.[2]

When asked by HO Simmons if he had been to the Medical Unit for help with his teeth, Paul replied that it was "a joke." According to Paul, they told him that he needed to have his fillings re-done so that they could make him a dental plate to help with the teeth grinding. Paul replied that he had $400 and he would "buy [his] own goddamned plate", H.3, but the dentist informed him that they could not do anything until his fillings were treated.

Paul stated that showed the letter he received from the dentist to the two inmates, Doc and Smith, who were hassling him, and explained that there was nothing he could do to stop grinding his teeth. The inmates told him to "back [sic] up and move." H.4. That weekend, CO Burke was "doing moves", but Paul refused, saying, "why should I have to move because you two are nothing but inmates . . . [who] snore . . . and fart." Paul stated that Richardson and another inmate named Smith who slept near him had no problems with his teeth-grinding. Paul commented, "they better go to the

---

[2]
Numerals preceded by "H." refer to pages from the Tier III hearing transcript, attached as Ex. J to the Benitez Decl.(Dkt. #69).

-4-

anonymous tip because the anonymous tip is the one that put that
under my bed." H.7; see also H.8.

Simmons surmised, from Paul's rather diffuse narrative, that
his defense was that someone else (Doc and the first Smith) placed
the razor under his bed. When asked if he had anything else to
offer, the following colloquy ensued:

| | |
|---|---|
| Inmate Paul: | I suggest that these two inmates that are in the Housing unit that they should be questioned for putting that under there and . . . |
| Simmons: | I don't question people. |
| Inmate Paul: | Somebody put it there and I did not put it there and whoever made an anonymous tip to Mr. Burke had to have known who put it there, or he put it there himself. |
| Simmons: | Mr. Burke, now? |
| Inmate Paul: | No, the person who anonymously tipped Mr. Burke and told him that there was a razor taped under my bed, put that razor under my bed. |
| . . . | |

H.9-10. Just prior to the close of the hearing, but before HO
Simmons issued his findings and disposition, Paul brought up the
"anonymous tip" again:

| | |
|---|---|
| Inmate Paul: | When they had an informant tip, Mr. Burke is liable to bring his informant tip to his hearing, right, if I request it? |
| Simmons: | You should have requested that. |
| Inmate Paul: | I request it now. |
| Simmons: | It's too late now. The whole hearing is over. |
| . . . | |

H.17. Relying upon CO Burke's misbehavior report and his
examination of the altered razor, HO Simmons found Paul guilty of
the charged infraction. H.14. According to HO Simmons, Paul's

defense that he did not place the razor under his bed was "irrelevant" because Rule 113.10 "clearly states" that inmates possess any weapons. H.14.  HO Simmons imposed a punishment of 90 days in SHU and 90 days loss of recreation, packages, commissary, phones, and earphones. Paul ultimately served 81 days of the SHU sentence.

Paul pursued an administrative appeal of HO Simmons' decision. On May 22, 2001, Selsky issued a Review of Superintendent's Hearing which summarily declared that Paul's Superintendent's Hearing had been "reviewed and affirmed[.]" Ex. L to Benitez Decl. (Dkt. #69).

Represented by pro bono counsel, Paul then filed a proceeding pursuant to Article 78 of New York Civil Practice Law and Rules ("C.P.L.R.") in Wyoming County Supreme Court challenging the results of his Superintendent's Hearing. Paul's attorney argued that although a hearing officer could reject as not credible Paul's testimony that he did not know how the razor came to be taped under his bed, it was error for the hearing officer to categorically state that such testimony was irrelevant to considering whether he was guilty of the rule violation for possessing a weapon in his area of responsibility. The Wyoming County Supreme Court affirmed the Tier III hearing, and Paul sought leave to appeal to the Appellate Division, Fourth Department.

While the appeal was pending, Selsky sent a memorandum dated March 8, 2002, to K.S. Perlman, Superintendent of Mohawk

Correctional Facility, stating that Paul's Superintendent's Hearing had been "reversed . . . for the following reasons(s): reversed after discussion with Attorney General's Office due to failure to address inmates [sic] defense[.]" Ex. A to Benitez Decl. (Dkt. #69). The memo went on to state that records containing references to the hearing were to be expunged. Id.

Based upon the administrative reversal issued on March 8, 2002, the parties signed a stipulation of discontinuance on April 24, 2002, terminating Paul's C.P.L.R. Article 78 proceeding. Ex. B to Benitez Decl. (Dkt. #69).

Paul, acting pro se, then instituted the present § 1983 action in this Court, and the parties engaged in limited discovery. Defendants filed a motion for summary judgment (Dkt. #20) on August 14, 2006. The Court (Siragusa, D.J.) granted (Dkt. #28) Paul's renewed motion to appoint counsel on November 15, 2006.

With the Court's permission, Plaintiff filed a motion to amend (Dkt. #34) the complaint to add certain defendants whose identities were unknown. The application was granted by Magistrate Judge Feldman on September 6, 2007 (Dkt. #36), and discovery was extended.

The Amended Complaint ("Am. Compl.") (Dkt. #38), filed on December 13, 2007, included allegations that from December 2000, to March 2001, while Plaintiff was at Gowanda, he was repeatedly denied access to dental services so that he could be fitted with a

-7-

mouthguard for his teeth-grinding. Plaintiff also alleged that a John Doe denied him medical care on April 6, April 11, and April 20, 2001, while he was incarcerated at Orleans Correctional Facility, where he was transferred after the Tier III hearing. Am. Compl., ¶¶ 35-36, 39, 49. Plaintiff asserted that he complained to a Captain at Orleans complaining about the dental department's failure to respond to his sick call slips. Id., ¶¶37-38. However, the only new defendant named in the Amended Complaint was a "John Doe" who allegedly denied Plaintiff medical services while at Gowanda.

With regard to the Tier III hearing, Paul alleged that HO Simmons erred in stating that it was "not his job to check into the facts as to how the razor got taped under the plaintiff's bed (or whether he knew it was there), and that it was not relevant to the purpose of the hearing." Am. Compl., ¶ 19 (Dkt. #38). Paul alleged that Selsky's eventual reversal of Simmons' finding of guilt confirmed that Selsky knew Simmons had violated Paul's due process rights to a hearing before a fair and impartial arbiter. Paul also alleged that Selsky had failed to properly train and supervise Simmons.

Defendants did not submit an answer to the Amended Complaint.

Plaintiff's deposition was conducted on May 15, 2006. See Ex. D (Paul Deposition ("Dep.")) to Declaration of Scott Shimick, Esq. ("Shimick Decl.") (Dkt. #53). The depositions of Peter R.

Kowalski, DDS, a dentist at Albion, and Christopher M. Yehl, Deputy Superintendent of Security at Gowanda since 2010, were conducted on February 22, 2011. Only portions of these depositions have been submitted as part of the record in this case. See Exs. B (Kowalski Dep.) & C (Yehl Dep.) to Shimick Decl. (Dkt. #53). Plaintiff's counsel subsequently determined that neither of these witnesses had knowledge relevant to Paul's lawsuit.

On May 27, 2011, counsel for Plaintiff submitted opposition papers (Dkt. #55) to Defendants' Motion for Summary Judgment. Also on that date, Plaintiff filed a Cross-Motion to Compel Discovery and For Costs (Dkt. ##53, 54, 55 & 56) ("the Motion to Compel") and a Statement of Undisputed Facts (Dkt. #57) in connection with Defendants' Motion for Summary Judgment. Defendants opposed the Motion to Compel. On June 23, 2011, Defendants submitted their Reply Memorandum of Law (Dkt. #61) in connection with the summary judgment motion.

District Judge Siragusa referred the Motion to Compel to Magistrate Judge Feldman, who denied the motion without prejudice (Dkt. #64), stating that the determination of whether the discovery sought herein by Plaintiff was necessary or relevant to Defendants' summary judgment motion should be made by District Judge Siragusa. Magistrate Judge Feldman stated that if Judge Siragusa decided that such discovery was necessary for a proper determination of the

summary judgment motion, the Motion to Compel would be restored to Magistrate Judge Feldman's calendar for determination.

On July 26, 2011, the case was referred to Magistrate Judge Victor Bianchini for mediation. See Dkt. #65. A status conference was held on November 21, 2011 (Dkt. #66), at which time Judge Siragusa stated that he would rule on Defendants' Motion for Summary Judgment after reviewing Plaintiff's Motion to Compel Discovery.

This matter was referred to the undersigned on May 3, 2012. (Dkt. #67). After reviewing the record, the Court noted that in support of his pending motion to compel discovery and for costs, Plaintiff submitted a letter from Wayne L. Benjamin, Deputy Solicitor General of the State of New York, dated May 14, 2002, to Carl M. Darnall, Clerk of the Appellate Division, Fourth Department, of New York State Supreme Court. See Dkt. #53-7. Mr. Benjamin stated that in connection with Plaintiff's appeal of his

disciplinary ruling, the State of New York would not be submitting a brief. Mr. Benjamin stated that he was enclosing a copy of the Departmental Memorandum indicating that the determination at issue had been administratively reversed and all references to the disciplinary expunged from Plaintiff's record. However, Plaintiff did not submit the enclosed Departmental Memorandum to the Court.

Accordingly, for purposes of having as complete a record as possible, the Court directed Defendants to supply the Court with a copy of the above-described Departmental Memorandum, as well as any other documents produced in connection with the administrative reversal of Plaintiff's Tier III violation and the expungement of his institutional record. Defendants timely produced these documents, attached to the Benitez Decl. (Dkt. #69).

The Motion for Summary Judgment and Motion to Compel are now fully submitted and ready for decision. As discussed further below, Plaintiff has failed to raise a triable issue of fact as to whether he possessed a protected liberty interest. Accordingly, Defendants' summary judgment motion is granted, and the Amended Complaint is dismissed with prejudice. Plaintiff's Motion to Compel is dismissed with prejudice.

## III. General Legal Principles

### A.    42 U.S.C. § 1983

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 which requires that a plaintiff allege, in order to state a claim under § 1983, the following elements: (1) conduct  attributable at least in part to a person acting under color of state law, and (2) deprivation, as the result of the challenged conduct, of a right, privilege, or immunity secured by the Constitution or laws of the United States. Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir.1993). The § 1983 plaintiff must adequately demonstrate

-11-

"personal involvement of defendants in alleged Constitutional deprivations." Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

### B.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

Initially, the moving party must show that there is "an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has carried its burden under F.R.C.P. 56, the opposing party must set forth "specific facts showing that there is a genuine issue for trial[,]" Fed. R. Civ. P. 56(e), and must introduce evidence beyond the mere pleadings to show that there is an issue of material fact concerning "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

### III. Analysis of Plaintiff' Due Process Claim

Paul claims principally that he was deprived of due process at the Tier III hearing. However, if Paul "cannot establish that he had a protected liberty interest in being free from the punishment that was imposed upon him as a result of that hearing, he has no due process claim under the Fourteenth Amendment." Scott v. Albury, 156 F.3d 283, 286 (2d Cir. 1998) (per curiam) (citing Frazier v. Coughlin, 81 F.3d 313, 318 (2d Cir. 1996) (per curiam)). In other words, "[t]he two threshold questions in any § 1983 claim for denial of procedural due process are whether the plaintiff possessed a liberty or property interest protected by the United States Constitution or federal statutes and, if so, what process was due before the plaintiff could be deprived of that interest." Green v. Bauvi, 46 F.3d 189, 194 (2d Cir. 1995) (citations omitted).

Relying on Sandin v. Conner, 515 U.S. 472 (1995), Defendants assert that Plaintiff has not sufficiently established the deprivation of a protected liberty interest. Plaintiff's counsel asserts that Paul was deprived of a protected liberty interest in the following ways. First, he spent 81 days in disciplinary confinement in SHU. Second, he was transferred from Gowanda, a medium security facility, to Attica, a maximum security facility, where he spent 298 days and was "confined for 23 hours every day and experienced minimal personal contact[,]" Plaintiff's Memorandum

-13-

of Law ("Pl. Mem.") at 4-5 (Dkt. #55). Plaintiff contends that his case is analogous to Wilkinson v. Austin, 545 U.S. 209 (2005), which he characterizes as holding that "placement in a maximum security prison from a lesser security prison created a liberty interest because the conditions created atypical hardship on the inmates." Pl. Mem. at 4 (citing Wilkinson, 545 U.S. at 224). Third, Plaintiff was unable to complete his substance abuse treatment program because he was placed in SHU. Fourth, the adverse finding on the weapons-possession charge and SHU incarceration resulted in Plaintiff being denied parole. Fifth, Plaintiff "lost his opportunity for work release and the other quality of life benefits afforded to prisoners at facilities that are not maximum security." Pl. Mem. at 5 (citing Shimick Decl., ¶¶ 32-34). The Court considers each of these claimed liberty interests in turn below.

A.    **81-Day Disciplinary Confinement in SHU**

In Hewitt v. Helms, 459 U.S. 460 (1983), and related cases, the United States Supreme Court held that when a prisoner brings an action under 42 U.S. § 1983 asserting a due process right that is premised on a state-created liberty interest, the prisoner must establish that the state's laws in fact create such a liberty interest. Welch v. Bartlett, 196 F.3d 389, 392 (2d Cir. 1999). In Sandin, however, the Supreme Court ruled that "a mandatory obligation of prison officials for the prisoner's benefit is insufficient in itself to create a due process right enforceable by

-14-

an action under § 1983." 196 F.3d at 392. Instead, to be actionable, the liberty interest "must also be such that its deprivation would subject the prisoner to 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.'" Id. (quoting Sandin, 515 U.S. at 484).

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life[.]'" Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (quoting Sandin, 515 U.S. at 484; citing Frazier, 81 F.3d at 317). Thus, "[a]fter Sandin, a prisoner who experiences a deprivation arising under mandatory rules has no actionable due process claim if other prisoners experience approximately the same deprivation in the ordinary administration of the prison with sufficient regularity that such deprivation is typical." Welch, 196 F.3d at 392 (citing Frazier, 81 F.3d at 317-18).

In assessing atypicality under Sandin, the reviewing court must look to the "actual punishment" imposed." Scott v. Albury, 156 F.3d at 287; accord Wheeler v. Butler, 209 Fed. Appx. 14, *15, 2006 WL 3770830, at **2 (2d Cir. Dec. 13, 2006). The Second Circuit has explained that Sandin "frames a backward-looking inquiry (as to the liberty interest) that measures the hardship in terms of the plaintiff's experience." Scott, 156 F.3d at 286.

Here, the duration of Paul's actual confinement, 81 days, "was not long enough to constitute an atypical and significant deprivation by itself." Palmer, 364 F.3d at 66 (77 days in segregated disciplinary confinement); see also Wheeler, 209 Fed. Appx. *16, 2006 WL 3770830, at **2 (86 days in segregated disciplinary confinement "'was not long enough to constitute an atypical and significant deprivation by itself'") (quoting Palmer, 364 F.3d at 66; citing Sealey v. Giltner, 197 F.3d 578, 589-90 (2d Cir. 1999) ("Assessing Sealey's 101-day confinement in the Auburn SHU . . . in light of these principles and with his testimony credited, we agree . . . that he has not shown confinement of a duration and in such conditions as to meet the Sandin standard of atypicality.")).

The "atypicality" analysis therefore turns on the conditions of Paul's disciplinary confinement. See Palmer, 364 F.3d at 66 ("[D]uration is not the only relevant factor. The conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of 'atypical and severe hardship . . . .'") (quoting Ortiz v. McBride, 323 F.3d 191, 195 (2d Cir. 2003) (per curiam) (ellipsis in original)). If the conditions of disciplinary confinement "taken in totality, were especially harsh 'vis-a-vis both the conditions in [segregated] confinement and in the general prison population,' they may 'violate a liberty interest despite the "comparative

-16-

shortness" of [the] confinement.'" <u>Palmer</u>, 364 F.3d at 66 (quoting <u>Ortiz</u>, 323 F.3d at 195; other citation omitted).

Under the "normal conditions of SHU confinement in New York," the prisoner is

> placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors [are] permitted, but the frequency and duration [is] less than in general population. The number of books allowed in the cell [is] also limited.

<u>Colon v. Howard</u>, 215 F.3d 227, 230 (2d Cir. 2000) (citation omitted); <u>see also Palmer</u>, 364 F3d at 66 n.3 (citing N.Y. Comp. Codes R. & Regs. tit. 7, §§ 304.1-.14, 305.1-.6 (2003)).

Here, Plaintiff does not complain about the conditions of his confinement in SHU in either his original Complaint or Amended Complaint. In opposition to Defendants' summary motion, plaintiff's counsel did not submit a declaration or affidavit signed by Paul regarding the specific conditions of confinement he endured in SHU.[3] Indeed, no mention is made in Plaintiff's opposition papers regarding the conditions he experienced in SHU. Plaintiff's

---

[3] Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); <u>see also</u> <u>Sitts v. United States</u>, 811 F.2d 736, 741-42 (2d Cir. 1987) (noting the general rule that "an attorney's affidavit alone is insufficient to support a motion for summary judgment").

counsel, in his memorandum of law, only mentioned one specific condition of Paul's confinement, and it was while Paul was in general population,[4] not disciplinary segregation.

The Court notes that the Second Circuit has instructed district courts "to develop detailed factual records 'in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days.'" Sims v. Artuz, 230 F.3d 14, 23 (2d Cir. 2000) (quoting Colon v. Howard, 215 F.3d at 232 (footnote omitted in Sims)); see also Colon, 215 F.3d at 231 (noting that "[t]he longest confinement in normal SHU conditions that [the Second Circuit] [has] ruled was not shown to meet the Sandin standard was 101 days," discussing Sealey, 197 F.3d at 585); Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004) ("[W]ith respect to 'normal' SHU confinement, we have held that a 101-day confinement does not meet the Sandin standard of atypicality.") (citing Sealey, 197 F.3d at 589), cert. denied, 125 S. Ct. 1398 (2005). Here, however, the actual time spent by Paul in SHU was 81 days-less than the threshold of 101 days specified in Sims, 230 F.3d at 23. Thus, it falls outside the range of cases for which the

---

[4]

Counsel stated that Plaintiff was made to spend 23 hours a day confined while he was at Attica, the maximum facility to which he was transferred after his release from SHU. In any event, a court generally may not rely on factual allegations contained in legal briefs or memoranda. Friedl v. City of New York, 210 F.3d 79, 83-84 (2d Cir. 2000).

Second Circuit has directed the district courts to develop detailed factual records. See Sims v. Artuz, 230 F.3d at 23.

Moreover, where the Second Circuit have reversed grants of summary judgment or motions to dismiss based upon the failure to establish a liberty interest in being free from SHU confinement, the plaintiff-inmate has presented sworn averments regarding the conditions he experienced in SHU and has affirmatively sought to make a record regarding the atypicality of his segregated disciplinary confinement. See, e.g., Davis v. Barrett, 576 F.3d 129, 134 (2d Cir. 2009) (noting that plaintiff "asserted in his sworn affidavit that he was kept in his cell twenty-four hours per day, that he was denied participation in any cell study program, and that he was not given commissary privileges . . . that he was subjected to unhygienic conditions, specifically that . . . his cell had no furniture, and thus all items, including his clothes and food tray, had to be kept on the floor; . . . that his mattress was 'infected' with body waste; and . . . that his cell was subject to 'daily' flooding, and feces and urine thrown by other inmates"). As noted above, Paul has not done so in this case. See Brown v. Secore, Civ. No. 9:08-CV-085, 2010 WL 9800233, at *6 (N.D.N.Y. Mar. 15, 2010) (granting summary judgment on Sandin issue where "despite several opportunities to make a record with respect to any atypical or unusual conditions of confinement, the plaintiff has never alleged that he was subjected to anything other than the standard

conditions of segregated housing at Franklin" and there was thus "no factual support in the record for the position that the 30-day keeplock sanction imposed upon the plaintiff constituted an atypical or significant hardship that would be protected by the Due Process Clause"). Here, Plaintiff has failed to show any circumstances, other than the length of his confinement, to show that his stay in SHU for 81 days was in any way atypical or a significant hardship in relation to the ordinary incidents of prison life. Indeed, "[t]he entire focus of his allegations is on the alleged due process violations in connection with the disciplinary hearing, not on the conditions of his confinement." Durran v. Selsky, 251 F. Supp.2d 1208, 1214 (W.D.N.Y. 2003) (plaintiff failed to meet "atypical and significant hardship" standard of Sandin where only circumstance of confinement alleged was length of stay (90 days) in SHU).

It bears noting that "[o]n a motion for summary judgment, it is the duty of the attorneys, not the Court, to sift through the record and bring to the Court's attention the pertinent information that may create a triable issue of fact." Brisbois v. United States, No. 1:03-CV-1214, 2005 WL 1331129, at *2 (N.D.N.Y. June 1, 2005) (citing Amnesty America v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir. 2002)("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to

find proof of a factual dispute.") (citations omitted)). On the record before the Court, Plaintiff has failed to demonstrate a genuine issue of material fact regarding whether the SHU sentence imposed following the Tier III hearing constituted an atypical or significant hardship entitled to protection under the Due Process Clause.

**C.   Inability to Complete Substance Abuse Treatment Program**

Plaintiff contends that because of his unconstitutional Tier III hearing and placement in SHU, he was unable to complete a required substance abuse treatment program. Plaintiff has not shown the infringement on a liberty interest, however, because inmates do not have a constitutional right to participate in prison programs. See Moody v. Daggett, 429 U.S. 78 (1976) (citing Meachum v. Fano, 427 U.S. 215, 225 (1976)). In Moody v. Daggett, the petitioner argued that a pending warrant and detainer issued in connection with his parole revocation adversely affected his prison classification and qualification for institutional programs. 429 U.S. at 88 n.9. Noting that it had "rejected the notion that every state action carrying adverse consequences for prison inmates automatically activates a due process right[,]" id. (citation omitted), the Supreme Court stated that "[t]he same [was] true of prisoner classification and eligibility for rehabilitative programs in the federal system." Id. Since Congress has given federal prison officials "full discretion to control these conditions of

-21-

confinement," the petitioner had "no legitimate statutory or constitutional entitlement sufficient to invoke due process." Id.[5] Thus, the Supreme Court rejected the notion that a petitioner's due process rights are implicated when he alleges an adverse impact on his ability to participate in a discretionary prison program. Based upon Moody, the Court concludes that Paul has failed to state a due process claim grounded on the theory that the disciplinary ruling prevented his participation in a substance abuse treatment program.

Accord, e.g., Thompson v. LaClair, No. 9:08-CV-37 (FJS/DEP), 2008 WL 191212, at *4 (N.D.N.Y. Jan. 22, 2008); Gissendanner v. Menifee, 975 F. Supp. 249, 251 (W.D.N.Y. 1997); Deutsch v. United States, 943 F. Supp. 276 (W.D.N.Y. 1996) ("Deutsch claims further that because the warrant and detainer are lodged against him, he is being subject to tougher security measures and is not entitled to participate in the Community Correction Center Program. BOP's denial of participation in no way violates Deutsch's constitutional rights.") (citing, inter alia, Castronova v. United States Parole Comm'n, 94-CV-606S, 1995 WL 604327, at *6 (W.D.N.Y. Aug. 29, 1995)); Ortiz v. Immigration and Naturalization Service, C-93-0089-SBA, 1993 WL 102831, at *2 (N.D. Cal. Mar. 22, 1993).

---

[5]
Likewise, the New York State Legislature has given NYSDOCCS full discretion to control the eligibility requirements vis-a-vis treatment programs such as the substance abuse treatment program from which Paul claims he was unlawfully excluded by virtue of his Tier III disciplinary hearing.

D.    **Adverse Impact on Parole Decision**

Paul contends that the Tier III hearing and his SHU sentence had a detrimental effect on his parole evaluation. Even assuming this was the case, Paul has not established the deprivation of a liberty interest because inmates do not have a constitutional right to be released on parole. See Boothe v. Hammock, 605 F.2d 661, 664 (2d Cir. 1979) (no constitutionally protectable expectation of parole entitling inmate to due process safeguards). Thus, the Court concludes that Paul's due process claim grounded on the theory that the Tier III disciplinary hearing adversely affected his chances of parole fails to state an actionable claim under 42 U.S.C. § 1983. See Thompson v. LaClair, 2008 WL 191212, at *4 (finding that plaintiff inmate failed to state an actionable claim under 42 U.S.C. § 1983 where complaint alleged that his removal from the alcohol and substance abuse treatment program led to the potential for the denial parole, because inmates do not have a constitutional right to be released on parole or to participate in prison programs) (citations omitted).

E.    **Transfer From a Medium Security to a Maximum Security Facility**

Insofar as Paul contends that his transfer out of Gowanda to Attica, a maximum security facility,[6] constituted a Due Process

_____

[6]

NYSDOCCS inmates are housed in 70 different facilities, classified as maximum, medium or minimum security facilities. Inmates are also classified maximum, medium or minimum security. Although NYSDOCSS attempts to match prisoners' and prisons' security classifications, e.g.,

-23-

violation, Defendants are entitled to summary judgment. "Prison officials are vested with broad discretion to transfer inmates, and such transfers between facilities do not generally implicate Due Process rights." Freeman v. Goord, No. 02 Civ. 9033(PKC), 2005 WL 3333465, at *9 (S.D.N.Y. Dec. 7, 2005) (citing Meachum v. Fano, 427 U.S. at 225 ("That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules."); McKune v. Lile, 536 U.S. 24, 39 (2002) (re-affirming Meachum); Matiyn v. Henderson, 841 F.2d 31, 34 (2d Cir.) ("Matiyn's claim that the transfer from Auburn to Attica deprived him of a protected liberty interest without due process is without merit. As a general rule, there is no constitutionally based liberty interest that entitles a prisoner to a hearing or any other safeguards before being transferred from one prison to another, absent a state law or regulation conditioning such transfer on proof of misbehavior or other specified events.") (citing, inter alia, Montanye v. Haymes, 427 U.S. 236, 242 (1976)), cert. denied, 487 U.S. 1220 (1988)). Paul "had no liberty interest in remaining at the [Gowanda] facility since New York law does not place conditions on interprison transfers." Matiyn, 841 F.2d at 34 (citing, inter alia,

---

placing maximum security prisoners in a maximum facility, it is not always possible to do so. Edmonson v. Coughlin, 21 F. Supp.2d at 249.

<u>Montanye</u>, 427 U.S. at 242); <u>accord</u>, <u>e.g.</u>, <u>Freeman v. Goord</u>, 2005 WL 3333465, at *9 ("[P]laintiff's transfer out of Fishkill does not implicate a liberty interest upon which he may base a Due Process claim.").

## IV.  Analysis of Plaintiff's Eighth Amendment Claim

There are two elements to a prisoner's claim that officials violated his Eighth Amendment right to receive medical care: The plaintiff must show that he had a "'serious medical condition' and that it was met with 'deliberate indifference.'" <u>Caiozzo v. Koreman</u>, 581 F.3d 63, 72 (2d Cir. 2009) (quotation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." <u>Smith v. Carpenter</u>, 316 F.3d 178, 183-84 (2d Cir. 2003).

In his Amended Complaint, Paul names a "John Doe" at Gowanda Correctional Facility who allegedly denied him medical care. The specific allegations are that Plaintiff was "repeatedly denied access to dental services so that he could be fitted with a dental guard" from December 2000, to March 2001 (Am. Compl., ¶ 8); that Plaintiff "filled out sick call slips requesting to meet with a dentist but never received any response from the dental department at Gowanda Correctional Facility", or from the Superintendent (<u>id.</u>, ¶¶ 9, 10); and that as a result of the disruptiveness of his teeth

grinding, Plaintiff was disliked by other inmates (id., ¶ 11). The Amended Complaint alleges that Plaintiff suffered "excruciating pain" from grinding his teeth. Am. Compl., ¶ 39 (Dkt. #38).

Although Plaintiff does not name a John Doe or Jane Doe from Orleans Correctional Facility in the Amended Complaint, he makes allegations that he also was deprived of dental care while at Orleans in 2001. See id., ¶49 (Dkt. #38).

Defendants argue that the medical indifference claim against Selsky and Simmons must be dismissed because it fails to allege their personal involvement in the claimed constitutional deprivations. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (stating that it is well settled that "personal involvement . . . is a prerequisite to an award of damages under section 1983"). Plaintiff contends that because his Amended Complaint "cites a John Doe as responsible for the medical indifference claims", he can withstand a motion for summary judgment. Plaintiff also contends that Defendants' memorandum of law "has not denied the validity" of the Eighth Amendment claim but rather argues only that Selsky and Simmons are not responsible persons. Pl. Mem. at 8 (Dkt. #55). Therefore, Plaintiff asserts, Defendants' have "not met the burden to dismiss the medical indifference claims." Id. Plaintiff misapprehends his burden as the party opposing a motion for judgment on the pleadings. A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or

denials" asserted in his pleadings, <u>Rexnord Holdings, Inc. v. Bidermann</u>, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation, <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998).

The Court agrees with Defendants that the Eighth Amendment claims must be dismissed with regard to Simmons and Selsky as the record is devoid of any facts suggesting that either individual was even peripherally involved in the alleged failure to provide appropriate dental care to Paul.

With regard to the "John Doe" employed at Gowanda who allegedly failed to provide dental care, the Court finds that Paul has failed to raise a triable issue of fact as to whether this defendant was deliberately indifferent to a serious medical need. At the Tier III hearing, Paul testified that the Medical Unit personnel at Gowanda told him that he needed to have his fillings re-done so that they could make him a dental plate to help with the teeth grinding. Paul said that he had $400 in his account and he would "buy [his] own goddamned plate", but "[t]hey said there's no way you can do anything till the fillings are put in my mouth." H.3. Paul commented to HO Simmons, "What does fillings have to do with me getting a mouthpiece?" H.4. Because he disagreed with the Medical Unit's assessment, he apparently did not have his fillings re-done. Thus, the record indicates that the barrier to Paul obtaining a mouthguard was Paul himself.

Based upon Paul's own testimony, Medical Unit personnel at Gowanda were not indifferent to his medical needs. Rather, they informed him of the course of treatment he needed to follow (i.e., have his fillings replaced) before being fitted with a mouthguard, but he disagreed and wanted to pursue a different course of treatment (i.e., be fitted immediately with a mouthguard). While Plaintiff disagreed with the Medical Unit's recommendations, that does not give rise to civil rights claim for violation of his Eighth Amendment rights. See Garvin v. Armstrong, 236 F.3d 896, 897 (7th Cir. 2001) ("[A] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation.") (citation omitted). Paul's claim regarding the alleged lack of dental care at Gowanda cannot survive summary judgment.

With regard to allegations claim of medical indifference at Orleans Correctional Facility, Paul did not name a John or Jane Doe from Orleans in the Amended Complaint, and he has never sought leave to add an additional party or parties. Assuming for the sake of argument that Paul had named a defendant from Orleans allegedly responsible for the challenged conduct, Paul has not shown a genuine issue of material fact as to whether his teeth grinding was a serious medical need. Although Plaintiff's Amended Complaint, which was drafted by his attorneys, states that he suffered "excruciating pain" because of his teeth-grinding, Plaintiff's contemporaneous correspondence to prison officials and testimony at

the Tier III hearing do not mention pain as a reason for requesting a mouthguard. Instead, Plaintiff's pursuit of a mouthguard has been motivated by complaints from other inmates regarding the amount of noise he makes while sleeping.  Although "[d]ental conditions, like other medical conditions, may be of varying severity[,]" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998), the "standard for Eighth Amendment violations contemplates a condition of urgency that may result in degeneration or extreme pain[,]" id. (internal quotations and citations omitted).  Paul has not presented sufficient evidence to conclude that his dental issues were sufficiently serious for purposes of an Eighth Amendment claim. Cf. Chance, 143 F.3d at 702-03 (reversing dismissing of Eighth Amendment claim for failure to state claim; holding that great pain for at least six months, the inability to chew properly, and the possible extraction of three teeth sufficiently pled a serious medical need).

## V.   Plaintiff's Motion to Compel

In the Motion to Compel, Plaintiff seeks to take the depositions of a Sergeant Race, an Officer Domenico or Domingo, and an Officer Burns. The notices of deposition for these individuals state they were present when Plaintiff "was escorted to the 'box'" on an unidentified date. See Ex. A to Dkt. #55. Plaintiff does not indicate the claims to which these individuals' testimony is relevant. Plaintiff also has submitted a deposition notice directed

to the "New York State Department of Correctional Services" as part of the Motion to Compel.

In their opposition papers (Dkt. #60), Defendants argue that the Motion to Compel is untimely, having been filed after the Court's April 30, 2010, deadline for completion of discovery; is unsupported by proper subpoena notices; and is frivolous. Defendants' counsel contends that he does not represent NYSDOCCS or any of the corrections officers and asserts that personal jurisdiction is lacking over the non-parties named in the deposition notices. In addition, Defendants argue that the branch of Plaintiff's Motion to Compel seeking reimbursement for costs is premised on Selsky's and Simmons' failure to comply with a subpoena notice, which, Defendants state, is a nullity. See Dkt. #60 (citing Fed. R. Civ. P. 5, 30, 37 & 45).

Magistrate Judge Feldman issued an Order (Dkt. #47) dated February 3, 2010, stating that discovery was to be completed by April 30, 2010; motions were to be filed by May 30, 2010; and that no extension of the deadlines would be granted by the Court. Plaintiff did not file the Motion to Compel (Dkt. #54) until May 27, 2011, over a year after the deadline expired. Plaintiff's counsel avers that he made concerted efforts beginning in November 2009, to schedule the depositions of various witnesses, but that Defendants' counsel reneged on several verbal agreements, memorialized in correspondence between the attorneys, to schedule

-30-

these depositions. Plaintiff's counsel also states that two of the witnesses produced by Defendants' counsel (a dentist and a deputy superintendent of security) were not prepared to testify regarding the institutional knowledge of NYSDOCCS. Defendants' counsel contends that he consistently notified Plaintiff's counsel that he did not represent the non-parties named in the deposition notices.

Plaintiff's Motion to Compel clearly is untimely. Magistrate Judge Feldman's Order setting the discovery deadline specifically stated that no extensions would be granted, and Plaintiff did not seek an extension of time. Plaintiff's counsel was aware for many months of Defendants' counsel's objections to certain of the depositions.

The Court need not determine the timeliness issue because it finds that the Motion to Compel should be dismissed as without merit. Plaintiff alleges that Defendants possession information that has not been disclosed that may demonstrate that the sanctions imposed against Plaintiff were protected liberty interests. However, as discussed above, most of the consequences (e.g., inability to complete the substance abuse treatment program) were, as a matter of law, not protected liberty interests. With respect to Plaintiff's stay in SHU, the more important information concerning the conditions of Plaintiff's confinement would have come from Plaintiff himself. However, he did not supply such information to the Court.

Plaintiff contends that Defendants may have information that has not been disclosed which would demonstrate that Plaintiff's due process rights were violated at the Tier III hearing "by showing lack of evidence considered at such hearing." Dkt. #55 at 9. This allegation does not make sense. In any event, the transcript of the hearing speaks for itself, and alone would have been sufficient for Plaintiff to argue that his due process rights were violated.

Plaintiff argues that Defendants have information that may reveal that Defendants did not have qualified immunity by showing that it was "clearly established" to Defendants that an inmate had a right of due process with respect to the Tier III hearing. Again, this allegation is nonsensical. Plaintiff misapprehends the qualified immunity analysis.

Finally, Plaintiff contends that Defendants have information that has not been disclosed which will allow Plaintiff to name John Doe and "may demonstrate" Defendants' medical indifference. Id. Plaintiff had alternative means of ascertaining the identity of the John Doe named in the Amended Complaint, such as by propounding interrogatories to Defendants. This Plaintiff apparently did not do.

In sum, Plaintiff's justifications for demanding discovery past the deadline are not compelling, are vague, and would not produce information enabling Plaintiff to defeat Defendants' Motion for Summary Judgment. See Gualandi v. Adams, 385 F.3d 236, 244 (2d

-32-

Cir. 2004) ("To request discovery under Rule 56(f), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful.") (citation omitted). The Cross-Motion to Compel and For Costs is denied with prejudice.

## VI.   Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. #20) is granted, and the Amended Complaint (Dkt. #38) is dismissed in its entirety with prejudice. Plaintiff's Cross-Motion to Compel and For Costs (Dkt. #54) is denied with prejudice. The Clerk of the Court is directed to close the case.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     June 29, 2012
           Rochester, New York